# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **CYNOSURE, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 1:17-cv-11361-RWZ** |
| **v.** | § | |
| | § | |
| | § | Leave to File Granted on August 10, 2017 |
| **INVASIX, INC. d/b/a** | § | |
| **INMODE AESTHETIC SOLUTIONS, and** | § | |
| **DOES 1 through 10,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff, Cynosure, Inc. ("Cynosure"), files this First Amended Complaint and Application for Injunctive Relief against Defendant, Invasix, Inc. d/b/a InMode Aesthetic Solutions ("InMode").

## I.      PARTIES

1.      Cynosure is a Delaware corporation and maintains its corporate headquarters and principal place of business in Westford, Massachusetts.

2.      InMode is an Israeli entity with a principal place of business at Tabor Building, Shaar Yokneam, Yokneam 20692, Israel.

3.      InMode has a United States office at 21084 Bake Parkway, Ste. 106, Lake Forest, California 92630.  From in or around 2016, InMode, a competitor of Cynosure, has engaged in unfair competition by hiring Cynosure employees in violation of their fiduciary duties (the "Poached Employees") to acquire, misappropriate, and use Cynosure's confidential information and trade secrets.  InMode employed the Poached Employees in or around Houston, Texas.

4.     The Poached Employees include, but are not limited to: Shakil Lakhani ("Lakhani"), Tyler Lembke ("Lembke"), Lance Baird ("Baird"), Douglas Kaufman ("Kaufman"), Jonathan D'Arc ("D'Arc"), Jayson McLeod ("McLeod"), Victor Upshaw ("Upshaw"), and Mitchell Good ("Good").

5.     Cynosure is informed and believes, and on that basis alleges, that the Defendants identified as DOES 1 through 10, inclusive, are in some manner legally responsible for the damages and/or other things alleged herein.  Cynosure is currently unaware of the true names and/or capacities of DOES 1 through 10, inclusive, and, therefore, sue them in a fictitious manner.  Cynosure will amend its complaint upon ascertaining their identities.

## II.     JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332 as the amount in controversy exceeds the sum or value of $75,000, and Cynosure and InMode are citizens of different states.

7.     InMode has wrongfully and tortiously interfered with Cynosure's business operations and employee fiduciary duties in Texas and elsewhere, as detailed in this complaint, and/or wrongfully used knowledge of and/or access to Cynosure's employees, trade secrets and confidential information in its activities in Texas and elsewhere as detailed in this complaint.

8.     Venue is proper in Houston County, Texas, pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to Cynosure's claims occurred in Houston County, Texas, and a substantial part of intellectual property that is the subject to the action is situated in Houston County, Texas.  Venue is also proper in the District of Massachusetts, to where this case has been transferred.

### III.   CHOICE OF LAW

9.      On June 26, 2017, the Southern District of Texas transferred this case to the District of Massachusetts, Boston Division, pursuant to 28 U.S.C § 1404(a).

10.     A transfer under Section 1404(a) mandates that this court apply the law of the transferor court, in this case, the laws of the State of Texas.   Under the Supreme Court's ruling in *Van Dusen v. Barrack*, when a case is transferred from one federal district to another under Section 1404(a) the transferee court must "apply the state law that would have been applied if there had been no change of venue." *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964).   Further, a "transferee forum [must] apply the law of the transferor court, regardless of who initiates the transfer.   A transfer under § 1404(a), in other words, does not change the law applicable to a diversity case." *Ferens v. John Deere Co.,* 494 U.S. 516, 523 (1990).

### IV.   NATURE OF THE CASE AND FACTS

11.     This is an action for injunctive relief and damages due to the actions of InMode, a direct competitor of Cynosure, for tortious interference, even to this day, with Cynosure's employee and business relationships, including but not limited to: inducement of the Poached Employees to breach their contractual and statutory and common law-based fiduciary duties to their employer including, for example, their respective dut(ies) of utmost loyalty, by, for example, inducing such employees to falsify motives and to take with them to a competitor certain confidential information; further, by inducing such employees to consider or actually violate the terms of certain contractual agreements with Cynosure, including, but not limited to, any non-competition, non-solicitation, and/or non-disclosure provisions in their Non-Disclosure,

Non-Solicitation and Non-Competition Agreements (the "Non-Competition Agreement") with Cynosure; and tortious interference with Cynosure's business, for the purpose of harming Cynosure's business and wrongfully obtaining an unfair competitive advantage in the marketplace.  And, certain employees' Non-Competition Agreements contain non-competition provisions prohibiting them for a period of one year after the termination or cessation of employment, from developing, designing, producing, marketing, selling or rendering or assisting any other person in marketing, selling or rendering products or services competitive with those developed, designed, produced, marketed, sold or rendered by Cynosure.  Even as of the date of filing of this complaint, InMode is engaging in the aforementioned and additional improper activities; for example, InMode agents, "Lauren" and "Sam Cooper", as such individuals refer to themselves, continue to call Cynosure accounts under the guise that these individuals work collaboratively with Cynosure, and that such Cynosure customers need to come in to talk with these individuals relative to the Cynosure product at issue.  Such representations are false.

12.     Cynosure is informed and believes, and on the basis of that information and belief alleges, that at all times mentioned in this complaint, the Poached Employees, including but not limited to Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman were the agents and employees of InMode, and in doing the things alleged in this complaint were acting within the course and scope of that agency and employment.

13.     InMode induced the Poached Employees to breach their respective fiduciary duties and respective Non-Competition Agreements in order to unlawfully compete with Cynosure and to obtain Cynosure's proprietary and trade secret information, and to solicit Cynosure employees.  InMode's campaign to poach continues, with former Cynosure employees now at InMode currently trying to recruit members of Cynosure's

workforce to join them.

14.     InMode's actions in interfering with Cynosure's business and its employee relationships in Texas and elsewhere, interference with Cynosure's employment contracts with its employees in Texas and elsewhere, and inducement of Cynosure's former employees in Texas and elsewhere to breach their employment contracts, continue to cause harm to Cynosure.

15.     Given the resultant harm, as alleged more fully below, Cynosure seeks injunctive and monetary relief from InMode for aiding and abetting to breach fiduciary duty, tortious interference with employment relationships and business relations, violation of the Texas uniform trade secrets act, unfair competition, and civil conspiracy.

**A.     CYNOSURE'S BUSINESS**

16.     Cynosure is a leading global developer and manufacturer of a broad array of light-based aesthetic and medical treatment systems.  Its products are used to provide a diverse range of treatment applications including body contouring, cellulite/fat reduction, hair removal, tattoo removal, wrinkle reduction, improving skin appearance through the treatment of superficial benign vascular and pigmented lesions, and the treatment of acne, leg veins, and cellulite.

17.     Cynosure markets, services, and supports products in over 60 countries and has offices in North America, the United Kingdom, and Canada, and distributors worldwide.

18.     Cynosure's products, described above, are graded by the FDA and regulated under various state laws as medical devices that can often be operated and used only by, or under the supervision of, a licensed medical doctor. Accordingly, Cynosure's customers are principally physicians, physician practice groups, and Med Spas that

employ a physician medical director.

19.     Cynosure has spent a great deal of money, time, labor, and skill in strategic planning and client development.   Through these efforts, Cynosure has developed a substantial amount of confidential information and trade secrets.   Cynosure's trade secrets and confidential information include, but are not limited to, information concerning: (a) proprietary product designs, specifications, and design plans; (b) proprietary and safeguarded cost structures; (c) confidential pricing structures and marketing techniques; (d) proprietary and confidential lists and contacts of reliable and cost effective local and overseas product manufacturing resources; (e) confidential internal employee development techniques, training, device knowledge, marketplace competition strategies; and (f) proprietary and safeguarded procedures to meet and exceed the specific requirements of Cynosure's customers.

20.     Cynosure's trade secrets and confidential information are valuable assets belonging solely to Cynosure, and not generally known, nor readily ascertainable, by the public or Cynosure's competitors.   The secret nature of this information gives Cynosure a competitive advantage in the marketplace.   Specifically, Cynosure derives actual and potential economic value from its trade secrets and confidential information, in part, because this information is not generally known to and not readily ascertainable through proper means by other persons who can obtain economic value from disclosure.

21.     Additionally, Cynosure has valuable and distinguished goodwill assets. For example, Cynosure has developed relationships with its customers and manufacturers. Cynosure expended substantial resources to build and maintain its relationships with its customers and manufacturers.

22.     Cynosure is involved in an extremely competitive industry in which

confidentiality and customer goodwill are valuable assets.

23.     Recognizing the value of resources that Cynosure invested in developing its intellectual property in the form of trade secrets and confidential information, Cynosure has taken numerous steps to ensure the continued confidentiality of its proprietary information.

24.     First, Cynosure makes it clear to its employees who work on and/or have access to its trade secrets and confidential information that such information is confidential and proprietary to Cynosure and is not to be used for anyone's benefit other than Cynosure and is not to be disclosed to competitors or persons not subject to keeping such information confidential.  In this regard, the Poached Employees signed Non-Competition Agreements acknowledging the confidential nature of Cynosure's intellectual property.

25.     Second, Cynosure's confidential information and trade secrets are safeguarded by several limited access measures.  As part of its limited access measures, Cynosure: (a) restricts office entry to employees or to visitors accompanied by employees; (b) restricts access to its computer systems through the use of computer passwords and computer firewalls; (c) promulgates rules for the dissemination of confidential information; and (d) keeps its office locked and secure during non-working hours with a security firm monitoring the building.

26.     Third, Cynosure limits the sharing and dissemination of trade secret and confidential information to those persons who need to know such information to perform their job duties.  Such information is known to Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman.

27.     Fourth, Cynosure requires its manufacturers and agents to execute

confidentiality and non-disclosure agreements to hold, maintain and not disclose to any other person or entity, without Cynosure's permission, Cynosure's confidential information and trade secrets. These manufacturers and agents agreed to take all reasonable steps necessary to maintain the secrecy of Cynosure's confidential information and trade secrets and to prevent the disclosure of Cynosure's confidential information and trade secrets to any other person or entity. Lakhani, Lembke, Baird and Kaufman are aware of the execution of confidentiality and non-disclosure agreements by Cynosure's manufacturers and agents relevant to this dispute.

28. All of these measures are specifically intended to ensure the continuing confidentiality of Cynosure's trade secrets and confidential information. Cynosure's trade secrets and confidential information are a large part of its success and are the result of many years of effort. A competitor with access to Cynosure's trade secrets and confidential information would use or inevitably use such information to its or his advantage and to the detriment of Cynosure. Moreover, the mere use of Cynosure's confidential and trade secret information in this highly competitive business would irreparably harm Cynosure by, among other things, causing loss of trust with Cynosure's customers, damages being inadequate to provide a complete remedy.

## B.   INMODE'S BUSINESS

29. InMode manufactures, markets, and sells medical devices that use radio frequency and light laser technology for skin treatment and contraction, skin tightening, hair removal, skin pigmentation and vascular lesions, cellulite/fat reduction, and body contouring, competing directly with Cynosure.

## C.   THE POACHED EMPLOYEES' EMPLOYMENT WITH CYNOSURE

30. Cynosure employed Mr. Lakhani in a number of positions, including

Territory Manager, Area Sales Manager and Sales Director.  In 2013, Mr. Lakhani was promoted to Regional Sales Director.  As Regional Sales Director, Lakhani had knowledge of Cynosure's top performing sales people and their margins, efforts, and skills not generally known in the industry or to the public.  Additionally, as Regional Sales Director, Mr. Lakhani attended high level meetings at Cynosure and was privy to the most sensitive of Cynosure trade secrets and confidential information.  As part of his duties, he was responsible for managing the territory managers.  Therefore, he had knowledge of Cynosure's contractual relationships with its sales people and the terms and basis of compensation of its sales people, not generally known in the industry or to the public. Cynosure employed Mr. Lembke on April 20, 2016.

31.     Cynosure employed Mr. Lembke in a number of positions, including MLT Product Specialist.  As an MLT Product Specialist, Mr. Lembke recently specialized in the introduction and launch of Cynosure's innovative niche technologies into the marketplace. As a Product Specialist for Cynosure, Mr. Lembke had knowledge of Cynosure's products and technologies not generally known in the industry or to the public.  As part of his duties, Lembke was also responsible for Cynosure's sales.  Therefore, he had knowledge of Cynosure's contractual relationships with its sales people and the terms and basis of compensation of its sales people, not generally known in the industry or to the public.  Mr. Lembke also had the opportunity to cultivate relationships with other member of the sales team, such as Mr. Lakhani.

32.     Cynosure employed Mr. Baird on May 21, 2012.  Cynosure employed Mr. Baird in a number of sales and management positions, including Area Sales Manager.  As an Area Sales Manager, Baird was a member of the sales team and had knowledge of Cynosure's top performing sales people and their margins, efforts, and skills not

generally known in the industry or to the public.  As part of his duties, he was responsible for Cynosure's sales.   Therefore, he had knowledge of Cynosure's contractual relationships with its sales people and the terms and basis of compensation of its sales people, not generally known in the industry or to the public.  Mr.  Baird also had the opportunity to cultivate relationships with other members of the sales team.

33.   Cynosure employed Mr. Kaufman on February 18, 2014.   Cynosure employed Mr. Kaufman in a number of sales and management positions, including Area Sales Manager.  As an Area Sales Manager, Mr. Kaufman was a member of the sales team and had knowledge of Cynosure's top performing sales people and their margins, efforts, and skills not generally known in the industry or to the public.  As part of his duties, he was responsible for Cynosure's sales. Therefore, he had knowledge of Cynosure's contractual relationships with its sales people and the terms and basis of compensation of its sales people, not generally known in the industry or to the public.  Mr.  Kaufman also had the opportunity to cultivate relationships with other members of the sales team.

34.   The Poached Employees had access to and knowledge of Cynosure's most valuable trade secrets and confidential information, including, but not limited to, its technology, business plan, marketing plan, customer lists, products, costs, pricing, and product development plans.

35.   At all relevant times herein, the Poached Employees owed Cynosure a duty of utmost loyalty.   Upon information and belief, InMode induced the Poached Employees to breach that fiduciary duty, among other legal duties, by requiring the Poached Employees to, among other things, misappropriate Cynosure's trade secrets, misappropriate Cynosure's confidential information, and solicit the departure of other

Cynosure employees and Cynosure customers while still working for Cynosure.

36.     Upon information and belief, InMode engaged in tortious interference with Cynosures's employment and business relationships in order to misappropriate Cynosure's confidential information.

37.     Further, and separately, in connection with their employment with Cynosure, the Poached Employees executed a Non-Competition Agreement, in which the Poached Employees agreed:

> For a period of one year after the termination or cessation of such employment for any reason, [he] will not directly or indirectly: (i) as an individual proprietor, partner, stockholder, officer, employee, director, joint venture, investor, lender consultant, or in any other capacity whatsoever (other than as the holder of not more than one percent of the combined voting power of the outstanding stock of a publicly held company), develop, design, produce, market, sell or render (or assist any other person in developing, designing, producing marketing, selling or rendering), products or services competitive with those developed, designed, produced, marketed, sold or rendered by the Company while [he] was employed by the Company; or (ii) solicit, divert or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company which were contracted, solicited or served by [him] while employed by the Company.

38.     The Poached Employees resigned from their positions at Cynosure to take on roles at InMode in breach of their fiduciary duties and in violation of certain non-competition obligations.   Specifically, upon information and belief, InMode induced the Poached Employees to appropriate Cynosure's trade secrets, appropriate Cynosure's confidential information, solicit the departure of other Cynosure employees, and solicit the departure of Cynosure customers.

## D.     INMODE's RAIDING OF CYNOSURE EMPLOYEES

39.     Upon information and belief, in late 2016, InMode began recruiting the

Poached Employees.

40.     For example, upon information and belief, in or around January 31, 2017, InMode's CEO of Americas, Erik Dowell, sent an email to InMode employees, to introduce Cynosure employees Mr. Lakhani and Mr. Lembke to InMode as "the dream team" for the purpose of providing Mr. Lakhani and Mr. Lembke with sales materials and presentations on InMode's products and technologies.  Erik Dowell sent this email to Mr. Lakhani and Mr. Lembke while they were still employed with Cynosure.

41.     As another example, on February 3, 2017, Erik Dowell of InMode copied Mr. Lakhani on an email, while Mr. Lakhani was still employed with Cynosure, informing Mr. Lakhani and others that InMode had approved salary increases for certain InMode employees.

42.     Upon information and belief, InMode required the Poached Employees to start working for InMode while still in the employ of Cynosure.

43.     Specifically, upon information and belief, while still working for Cynosure, InMode induced the Poached Employees to breach their fiduciary duties owed to Cynosure by requiring them to engage in the following actions while still in the employ of Cynosure:

a.   attend InMode corporate training sessions;

b.   contact clientele of Cynosure on behalf or for the benefit of InMode;

c.    contact key personnel and clientele of Cynosure (via contact information known to the Poached Employees solely by virtue of their employment with Cynosure) on behalf of or for the benefit of InMode;

d.   solicit business on behalf of or for the benefit of InMode;

e.   create new accounts with clientele of Cynosure on behalf or for the benefit of

InMode;

f.   solicit customers and clientele in the geographic area contemplated and encompassed by the Non-Competition Agreement.

44.     Upon information and belief, the Poached Employees are continuing to solicit Cynosure's customers and clientele in the geographic area contemplated and encompassed by the Non-Competition Agreement.

45.     Upon information and belief, the products which the Poached Employees are selling to Cynosure clients, on behalf of InMode, are being manufactured by InMode by the use of specifications, marketing information and other data and information proprietary to Cynosure, which was retained by the Poached Employees and disclosed to InMode in breach of their fiduciary duties and Non-Competition Agreements.

46.     Through the customer relationships the Poached Employees developed through Cynosure's reputation and goodwill during their employment, and knowledge of customers' lease expiration dates, purchase history, pricing, any complaints or issues and other Confidential Information, the Poached Employees will be able call upon, service, and sell to those customers without having to put in the time, effort, research, and work otherwise required to develop those customers and acquire their business – in effect giving InMode an unfair leg up in competing against Cynosure. Upon information and reasonable belief, Cynosure believes that the Poached Employees have used and disclosed, and may be continuing to use and disclose, Cynosure's Confidential Information in their employment with and for the benefit of InMode.

47.     Based on the above, upon information and belief, InMode solicited and hired the Poached Employees to work for InMode and become employed with InMode, while still employed by Cynosure, and used Cynosure's resources to do so.

48.     InMode employed the Poached Employees with knowledge of them having breached their fiduciary duties and contractual obligations to Cynosure, including their confidentiality and non-solicitation obligations, and with the understanding that, in performing their duties for InMode and making the desired personnel changes, the Poached Employees might breach further their fiduciary duties and violate their Non-Competition Agreements with Cynosure, including certain post-termination confidentiality and non-solicitation obligations.

49.     Upon information and belief, the Poached Employees' sale territories at InMode cover the same potential customer base and include many of the same customers as their former Cynosure territories.  This situation will lead to the inevitable use and disclosure of Cynosure's Confidential Information, and likely already has.  Knowledge of Cynosure's Confidential Information, including its customers, national business and marketing strategies, places InMode at an unfair competitive advantage against Cynosure.

50.     Upon information and belief, the Poached Employees had access to Cynosure's most valuable trade secrets and confidential information, including, but not limited to, its technology, business plans, marketing plans, customer lists, products, costs, pricing and product development plans.

51.     Upon information and reasonable belief, Cynosure believes that the Poached Employees have used and disclosed, and continue to use and disclose, Cynosure's Confidential Information on behalf of InMode and for InMode's benefit.

52.     Mr. Lakhani's last day of employment with Cynosure was February 10, 2017.  On February 14, 2017, InMode issued a press release that it had hired Mr. Lakhani as its Executive Vice President of Sales, North America.  Upon information and belief, Mr. Lakhani directly and indirectly, solicited Cynosure employees, on behalf of InMode,

to leave Cynosure and become employed with InMode.  For example, upon information and belief, Mr. Lakhani, acting on behalf of InMode, solicited Goode on the condition that he attend the Cynosure national sales meeting to obtain proprietary information from Cynosure, for the benefit of InMode. Upon information and belief, InMode has induced, encouraged, approved and/or ratified Mr. Lakhani's aforementioned actions.  The acts of Mr. Lakhani, were performed on behalf or for the benefit of InMode and/or while in the employment of InMode, and/or were within the course and scope of that employment or within the authority delegated by InMode.

53.     Mr.  Lembke's last day of employment with Cynosure was February 9, 2017.  On February 14, 2017, InMode issued a press release that it had hired Mr. Lembke as its Vice President of Sales for the West Region.  Upon information and belief, Mr. Lembke began assisting InMode while still in the employ of Cynosure.  For example, on January 30, 2017, Mr. Baird wrote to Mr. Lembke "I know the official start date isn't until Feb[ruary] 6th but I'd like to get a head start on learning some of the new technology and prep for upcoming meetings.  Can you see what we might be able to get out hands on as far as PowerPoint slides and if maybe there [is] a top rep[resentative] in another area who'd be open to chat possible?" (*Id.*)  In response, Mr. Lembke copied Erik Dowell at InMode and responded: "Erik, I'd like to get Lance some slides and data if possible. He's got some meetings already set and is ready to rock.  Let me know if we can get something in his hands or if we need to wait." (*Id.*)  Cynosure has invested substantial monies to create proprietary designs, solutions, initiatives and equipment to ensure that Cynosure can provide cutting edge technologies and services to its customers.  As a former MLT Products Specialist for Cynosure, Mr. Lembke attended high level meetings at Cynosure and was privy to the most sensitive trade secret and confidential information.

54.      Upon information and belief, Mr. Baird began assisting InMode while still in the employ of Cynosure.   On January 30, 2017, Mr. Baird wrote to Mr. Lembke "I know the official start date isn't until Feb[ruary] 6th but I'd like to get a head start on learning some of the new technology and prep for upcoming meetings.  Can you see what we might be able to get out hands on as far as PowerPoint slides and if maybe there [is] a top rep[resentative] in another area who'd be open to chat possible?" (*Id.*)  In response, Mr. Lembke copied Erik Dowell at InMode and responded: "Erik, I'd like to get Lance some slides and data if possible.  He's got some meetings already set and is ready to rock.  Let me know if we can get something in his hands or if we need to wait." (*Id.*)  Mr. Baird's last day of employment with Cynosure was January 30, 2017.  Upon information and belief, Mr. Baird was approached by Mr. Lakhani to join InMode.

55.      Upon information and belief, Mr. Kaufman began assisting InMode while still in the employ of Cynosure.   Upon information and belief, Mr. Kaufman was approached by Mr. Lakhani to join InMode.  Mr. Kaufman's last day of employment with Cynosure was January 30, 2017.

56.      Upon information and belief, InMode has induced, encouraged, approved and/or ratified the Poached Employees' aforementioned actions.  The acts of the Poached Employees were performed on behalf or for the benefit of InMode.  As a result of the Poached Employees' aforementioned breaches of their fiduciary duties and violation of their Non-Competition Agreements, Cynosure has suffered, and will continue to suffer, loss of business opportunity, violation of its intellectual property rights, a loss of business differentiation and reputation, and InMode will have acquired enhanced positioning and resources to compete in the market, all of which are damages directly or proximately caused by InMode.

16

### COUNT I – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

57.   Cynosure incorporates the preceding paragraphs to this complaint as if set forth fully herein.

58.   Texas law recognizes that employees owe their employers a fiduciary duty. At all times applicable herein, the Poached Employees owed a duty of loyalty to Cynosure. *McGowan & Co. v. Bogan,* 93 F.Supp.3d 624, 652 (S.D. Tex. 2015).   Texas courts have consistently held that "the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency."  *Abetter Trucking Co. v. Arizpe,* 113 S.W.3d 503, 510 (Tex. App. – Houston 2003); *Navigant Consulting v. Wilkinson*, 508 F.3d 277, 293, (Tex. App. – Dallas 2007); *Ray Mart Inc. v. Stock Bldh. Supple of Tex.* 302 F.App'x 232, 239 (5th Cir. 2008). For example, "the employee may not (1) appropriate the company's trade secrets; (2) solicit his employer's customers while still working for his employer; (3) solicit the departure of other employees while still working for his employer, or (4) carry away confidential information, such as customer lists." *Abetter Trucking*, 113 S.W. 3d at 512 (citing *Johnson*, 73 S.W.3d at 202); *Johnston v. Am. Speedreading Acad., Inc*., 526 S.W.2d 163, 166 (Tex. App.—Dallas 1975, no writ.); *Herrider Farms—El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 476-77 (Tex. App.— El Paso 1975, writ ref'd n.r.e.); *see also Navigant Consulting*, 508 F.3d at 284.

59.   InMode was aware that Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman owed a duty of loyalty to Cynosure and was aware that they had entered into Non-Competition and contractual obligations with Cynosure.

60.   Mr. Lakhani's, Mr. Lembke's, Mr. Baird's, and Mr. Kaufman's actions described above were done in breach of their duty of loyalty owed to Cynosure.  Further, their actions violated and continue to violate one or more provisions of their Non-

Competition Agreement with Cynosure, including the non-disclosure and non-solicitation provisions.

61.     InMode wrongfully and without justification, knowingly participated in Mr. Lakhani's, Mr. Lembke's, Mr. Baird's, and Mr. Kaufman's breaches of their fiduciary duties owed to Cynosure in order to misappropriate Cynosure's trade secrets and confidential information.   Further, InMode wrongfully and without justification, knowingly participated in Mr. Lakhani's, Mr. Lembke's, Mr. Baird's, and Mr. Kaufman's breaches of the non-competition, non-disclosure and/or non-solicitation provisions in their Non-Competition Agreements with Cynosure,

62.     InMode participated in the breach of duty owed to Cynosure, and therefore, is a joint tortfeasor with the fiduciary and is liable as such.

63.     InMode continues to employ Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman, with knowledge that their employment with InMode violates the terms of their Non-Competition Agreements with Cynosure.

64.     InMode's actions have damaged Cynosure and its goodwill and caused, and continues to cause, harm to Cynosure for which an adequate remedy at law does not exist.

## COUNT II – TORTIOUS INTERFERENCE WITH EMPLOYEE RELATIONS

65.     Cynosure incorporates the preceding paragraphs to this complaint as if set forth fully herein.

66.     InMode was aware of Cynosure's employer-employee relationship with Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman.

67.     InMode was aware that Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman had entered into valid Non-Competition and contractual obligations with

Cynosure.

68.     InMode was aware that Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman owed a duty of loyalty to Cynosure when they were employed with Cynosure.

69.     By aiding and abetting Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman to breach their respective fiduciary duties owed to Cynosure, InMode wrongfully and without justification interfered with Cynosure's employee relationships with Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman.

70.     InMode, wrongfully and without justification, tortiously interfered with Cynosure's employee relations by directing the Poached Employees to use Cynosure's confidential and proprietary information and trade secrets while they were still employed with Cynosure.

71.     InMode, wrongfully and without justification tortiously interfered with Cynosure's employee relations by directing Mr. Lakhani and Mr. Lembke to start recruiting Cynosure Employees while they were still in the employ of Cynosure.

72.     InMode, wrongfully and without justification, interfered with the Non-Competition Agreements between the Poached Employees and Cynosure.

73.     InMode's above described interference proximately caused Cynosure damage.

74.     InMode's actions have damaged Cynosure and its goodwill and caused, and continue to cause, harm to Cynosure for which an adequate remedy at law does not exist.

**COUNT III - VIOLATION OF TEXAS UNIFORM TRADE SECRETS ACT**

75.     Cynosure incorporates the preceding paragraphs to this complaint as if set forth fully herein.

76.     The customer, sales, pricing, marketing, business plans, and financial data of Cynosure described above, and the compilation of that information ("Trade Secrets"), is not generally known to and not readily ascertainable by proper means by other persons who can obtain economic value from its disclosure and use.

77.     Cynosure derives independent economic value from its Trade Secrets not being generally known to or readily ascertainable by others.

78.     Being in an extremely competitive industry, Cynosure's competitors, including InMode, can derive economic value from the disclosure and use of Cynosure's Trade Secrets.

79.     Cynosure's Trade Secrets are the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

80.     Cynosure's Trade Secrets constitute trade secrets under the Texas Uniform Trade Secrets Act, Tex. Civ. Prac. & Rem. Code §134(A).002(6).

81.     InMode, through the actions and continued actions of Mr. Lakhani, Mr. Lembke, Mr. Baird, and Mr. Kaufman, misappropriated Cynosure's Trade Secrets within the meaning of Tex. Civ. Prac. & Rem. Code §134(A).002(3), which defines "misappropriation" as:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

(a) derived from or through a person who had utilized improper means to acquire it;

(b) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(c) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

82.     InMode, through the actions and continued actions of Mr. Lakhani – its Vice-President of Sales – acquired, misappropriated, and continues to possess Cynosure's Trade Secrets through improper means within the meaning of Tex. Civ. Prac. & Rem. Code §134(A).002(2), which defined "improper means" to "include[] theft, bribery, misrepresentation, breach of inducement of a breach of duty to maintain secrecy, to limit use, or to prohibit discovery of a trade secret, or espionage through electronic or other means." Tex. Civ. Prac. & Rem. Code §134(A).002(2).

83.     InMode's possession of and refusal to return, as well as its use and/or threatened use, disclosure, and misappropriation of Cynosure's Trade Secrets has caused, and continues to cause, harm to Cynosure for which injunctive relief may be issued under Tex. Civ. Prac. & Rem. Code §134(A).003.

84.     Cynosure has also incurred actual damages as the result of InMode's possession of and refusal to return, as well as its use and/or threatened use, disclosure, and misappropriation of Cynosure's Trade Secrets.

85.     InMode's possession of and refusal to return, as well as its use and/or

21

threatened use, disclosure, and misappropriation of Cynosure's Trade Secrets was and has been willful and malicious, entitling Cynosure to an award of exemplary damages, pursuant to Tex. Civ. Prac. & Rem. Code §134(A).004, in an amount not exceeding twice any award made, and attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code §134(A).005.

## COUNT IV – UNFAIR COMPETITION

86.     Cynosure incorporates the preceding paragraphs to this complaint as if set forth fully herein.

87.     While still employed by Cynosure, the Poached Employees entered into agreements with InMode to start competing with Cynosure and used Cynosure's confidential and proprietary information and trade secrets, breached the Cynosure Non-Competition Agreements, and tortiously interfered with Cynosure's contracts, all as part of InMode's scheme to unlawfully compete.

88.     As set forth above, prior to resigning from Cynosure, the Poached Employees, at the direction of InMode, wrongfully took confidential information belonging to Cynosure that was created by Cynosure through extensive time, labor, skill, and money.

89.     Subsequently, InMode used Cynosure's confidential information, in competition with Cynosure and thereby gained a special advantage over Cynosure (i.e., a "free ride") because InMode is burdened with little or none of the expense incurred by Cynosure.

90.     As a result of InMode's unfair competition, Cynosure has suffered and continues to suffer injury, as described above, for which Cynosure is entitled to and is seeking monetary damages and injunctive relief.

91. By engaging the actions described herein, InMode used Cynosure's good will with the public to gain a competitive advantage in the market.

92. InMode's actions described herein, created a likelihood of confusion of the public.

### COUNT V – CIVIL CONSPIRACY

93. Cynosure incorporates the preceding paragraphs to this complaint as if set forth fully herein.

94. InMode conspired with the Poached Employees to breach fiduciary duties, misappropriate Cynosure's trade secrets and confidential information, and engage in unfair competition.

95. The Poached Employees owed a fiduciary duty to Cynosure.  Texas law recognizes third party liability for conspiring with employees to breach this duty.  *Herider Farms-El Paso, Inc. v. Criswell,* 519 S. W.3d 473, 476 (Tex. App. El Paso 1975, writ ref. n.r.e.)

96. While still employed by Cynosure, the Poached Employees entered into agreements with InMode to start competing with Cynosure and used Cynosure's confidential and proprietary information and trade secrets, and tortiously interfered with Cynosure's relations, all as part of InMode's scheme to unlawfully compete.

97. InMode had a meeting of the minds with the Poached Employees to engage in the course of action described above in order to further the business of InMode.

98. As described above, InMode conspired with the Poached Employees to commit the overt acts of breach of fiduciary duty, breach of contract, unfair competition and tortious interference in furtherance of the conspiracy.  InMode's conduct was malicious and wrongful.

99. As a result of InMode's civil conspiracy, Cynosure has been and continues to be damages. Among other things, Cynosure now has to replenish its workforce, and its goodwill and reputation have been put at risk. In addition, InMode is now unfairly competing head-to-head against Cynosure, using Cynosure's personnel, and it is believed, Cynosure's confidential, proprietary and trade secret information.

## V. DAMAGES

100. As a direct and proximate result of InMode's conduct, Cynosure has suffered actual damaged. Pursuant to the Texas Civil Practice & Remedies Code, Cynosure is entitled to recover damages it sustained and costs of suit, including reasonable attorney's fees. Tex. Civ. Prac. & Rem. Code §134(A).005.

## PRAYER FOR RELIEF

Cynosure asks for judgment against InMode for the following:

a. As to the First Claim for Relief, for Aiding and Abetting Breach of Fiduciary Duty, that this Court enter a Permanent Injunction enjoining InMode from employing Mr. Lakhani, Mr. Lembke, Mr. Baird and Mr. Kaufman until the expiration of the non-competition provisions in their respective Non-Competition Agreements with Cynosure; that this Court enter a Permanent Injunction enjoining InMode from inducing current and former Cynosure employees from breaching their fiduciary duties owed to Cynosure and from violating their Non-Competition Agreements with Cynosure; and awarding Cynosure its actual and punitive damages, costs, and such further relief to which it is entitled, whether at law or inequity;

b. As to the Second Claim for Relief, for Tortious Interference with Employee Relations, that this Court enter a Permanent Injunction enjoining InMode from interfering with Cynosure's employment contracts and relationships with its employees and that this Court enjoin InMode from hiring Cynosure employees until the expiration of the non-competition provisions in their respective Non-Competition Agreements; and awarding Cynosure its actual and punitive damages, costs, and such further relief to which it is entitled, whether at law or inequity;

c. As to the Third Claim for Relief, for Violation of Texas Uniform Trade Secrets Act, that this Court enter a Permanent Injunction enjoining InMode from using, disclosing, and refusing to return Cynosure's proprietary and

Confidential Information; awarding Cynosure exemplary damages under Tex. Civ. Prac. & Rem. Code §134(A).004; and awarding Cynosure its actual and punitive damages, costs, and such further relief to which it is entitled, whether at law or inequity;

d.     As to the Fourth Claim for Relief, for Unfair Competition, that this Court enter a Permanent Injunction enjoining InMode from using, disclosing, and refusing to return Cynosure's proprietary and Confidential Information; awarding Cynosure its actual damages and costs, punitive damages, and such further relief to which it is entitled, whether at law or inequity;

e.     As to the Fifth Claim for Relief, for Civil Conspiracy, that this Court enter a Permanent Injunction enjoining InMode from interfering with Cynosure's employment contracts and relationships with it employees and that this Court award Cynosure its actual damages and costs, punitive damages, and such further relief to which it is entitled, whether at law or inequity;

f.     On all claims for attorneys' fees as permitted by contract or statute; and

g.     All other relief the Court deems appropriate.

Respectfully submitted,

CYNOSURE, INC.

By its attorneys,

/s/ James Messenger
James Messenger (BBO #547236)
Brian Wall (BBO #688278)
Gordon Rees Scully Mansukhani, LLP
21 Custom House Street, 5th Floor
Boston, Massachusetts 02110
Phone: (857) 263-2000
Fax: (857) 264-2836
jmessenger@grsm.com
bwall@grsm.com

Dated: August 10, 2017

Of Counsel:
Craig J. Mariam, Esq.
Christina Nordsten, Esq.
Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 51st Floor
Los Angeles, CA 90017
Phone: (213) 576-5000
Fax: (877) 306-0043
cmariam@grsm.com
cnordsten@grsm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 10, 2017, a true copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, and notification of such filing will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent via mail to those indicated as non-registered participants.

/s/  James L. Messenger